S.K. And D.K. minors. The next case on the morning docket is 5-17-0180. In the interest of N.K., S.K., and D.K. minors, I'm going to call the witnesses in this case on the morning docket. We recognize this is an expedited decision. And Ms. Strong, for the... May it please the court, counsel, I'm Paige Strong, and I represent the mother in this case. This is an appeal from the determination of her parental rights from Franklin County. I raised four issues, all of which address the finding of unfitness, the first and foremost issue. And I'm going to talk about the first portion of the termination proceedings. One of the first things I want to point out about this case that I think is something we need to keep in mind while we're considering this is these children were taken into protective custody in June of 2012. In 2014, the petition to terminate her rights was filed about 23 months and a few days after they had been taken into custody. The final termination order was entered almost three years later. Three years. And while I don't raise an issue about the timing of that, because I think it is so unheard of that there's no case law about it, but it's something that we need to think about when we think about the nature of these proceedings. The entire purpose of entering an order is to provide permanency for children. And when the hearing phase of termination takes almost three years, there's something wrong. Why did it take three years? They would start the hearing. They would have a day of testimony. Then they would schedule further testimony for another day. It would be continued. It might be six months before they came back for additional testimony. Some of the attorney personnel changed, which is, of course, no one's fault. There was some health issues or multiple things. But I believe the actual fitness portion was four days, and that took well over two years itself. Two to two and a half years, just from start to finish. In the fitness space, one of the things that bothered me, actually, was there seemed to be a lot of delay between a report being issued and then actually being filed. I mean, months between the permanency order and the filing. And it's also an issue for me that, correct me if I'm wrong, but once the goal changed, services are withdrawn. That is correct. So it's almost like a catch-22, it seems, that if you have no services because of a goal change, then over that three years, how do you defend the nine-month limitation that they're putting into play for termination? You can't. You absolutely cannot. That would be a great question to ask. It's very frustrating the way these cases play out. And this is true of all of them. This one's extremely, yeah, this one's dramatic. It's very dramatic. And I brought that up just because I want you to be thinking about that while we talk about these arguments that I make. I raised four issues. I'm going to address two, unless you have questions about the others, recognizing that all four of them are important to the determination that you're going to have to make today. But, I mean, I would feel like I wasn't doing my job if I didn't point out the very obvious problem here. Could you give me those dates again real quick? The initial petition for adjudication was filed on June 28th of 2012. I believe the petition to terminate was filed on June 6th of 2014. And the final order actually terminating was filed on April 10th of 2017. So, this is a very long time. Very, very, very long time. Most of which, during most of that time period, my client was not offered any services because the goal had changed, which is just the nature of the setup, and it's completely counterproductive. And the goal change was, what date? 4-17-2014? Uh, you know what, I can't answer that right off the top of my head, but around that time. Yeah. I have 4-17-2014, which would be consistent with the 15- That makes sense. Interestingly, there was a permanency court report filed on May 5th of 2014 that said that my client had made reasonable and substantial progress toward the return home goal. Well, the original reason that these kids were taken was because of an older brother who had a drug overdose, right? Yes. And there was some reference, but not in the language very much, about by the time the termination was and that the brother was actually back in the home. Yes, because he was an adult. He was an adult at that point. There were two children. One was 18 and was released. And then there was a brother. This is why I say it wasn't really- Okay. There were a total of five children. Two that were older. Three that are the subject of this case. These were the youngest. The brother, the pregnant suicide, was also an adult by the time the termination- Oh, by the time the termination came around, yeah. Mm-hmm. And that is one of the issues that I wasn't going to talk about, about correcting the event that brought this all on was that he had overdosed, whether that was recreational or a suicide attempt. I'm not clear on from everything that I've read, but that my client did not call the 911 immediately. She didn't. Immediately is the- I believe it was about a day. It was some time before she called. I believe he was staying in a camper on the property. He wasn't staying inside the house. And she was sending the seven-year-old- To check. To check on him. Yeah. And so that's what brought all this up. That's how the children were taken into care. That child has some pretty serious mental health issues. And when there were visits during the pendency of this case, and there were sibling visits, quite often his presence was a problem. And that came up throughout the case. But he was an adult by the time termination proceedings came along. So we just focused on these three young children. But interestingly, one of the grounds for termination was that she had not corrected the conditions which brought the children into care. But we've never had a piece of evidence ever to say there was not a medical issue that she ignored. Now, to be fair, how could she? The children weren't living with her. So I don't know how it is she can correct a condition when she has no access to the children. So that's kind of a hinky one. And I didn't focus very much on that issue. I focused more on my very first issue was that the actual evidence presented over two and a half to three years was that my client had completed most of the services. However, she was rated unsatisfactory on her six-month service plan evaluations. And then the caseworkers testified as to their rating. In these cases, every six months, well, a service plan is provided. Within 45 days of the children being taken into care, a service plan is developed, and each parent is told, you need to do this, you need to do that, you need to do six different things. In almost every case, they are to do a psychological evaluation. Not every case in this case she was to do that. A drug and alcohol evaluation. You need parenting courses. You need a stable kind of income. You need a place to live. Those are the sorts of things that come up in a service plan. And then every six months, each party is evaluated by the caseworker to determine whether or not they have satisfactorily done particular tasks on their service plan. Also on the service plan is going to be included things like sign a release so that the DCFS worker can speak to the doctor that you're seeing. Those are like kind of ministerial things. And of course, my client did all of those things. She was rated satisfactory on, yes, she signed a release. Yes, she had an evaluation. Yes, this. Yes, that. But if she had not completed mental health treatment, which as you can imagine, doesn't get completed in six months' time, not when we have a lifetime of trouble to correct, then that will be rated as unsatisfactory. So at the end of the six-month period, you rate each task, and then you determine if overall the service plan has been satisfactory or unsatisfactory. So if you've got six things that she did satisfactorily and two that she did unsatisfactorily, the entire service plan will be rated unsatisfactory. So that's exactly what happened here. She completed a drug assessment. So at the very first, right off the bat, drug and alcohol assessment is found to need no services. So check. She did that satisfactorily. Then apparently she showed up in court under the influence of something. Clearly there's a problem that someone missed. They had her do another evaluation. She did that. They recommended treatment. She did that. She completed it. She was recommended to have a mental health evaluation. She met with Dr. Kosmicki, who did a lengthy evaluation on her, performed some tests, looked at her history, came up with some suggestions. He suggested a parenting course. He suggested DBT therapy. He suggested a number of things. But he also said at that point his prognosis for her to have the children return home was guarded because she has some mental health issues. She had a brain injury from an accident when she was younger. He had some concerns. This brain injury, does that affect her IQ? She does have a low IQ in the low 70s, like around 70. I don't know that those two things were connected by Dr. Kosmicki's report, but they were definitely things that he mentioned as why he has a guarded prognosis for her. So he makes these recommendations. Based on those recommendations, she is referred to all of these agencies, go get your mental health treatment, see a psychiatrist, do this, do that. Off she goes. She does all of those things. She does astoundingly well. Her DBT therapist testifies later and explains that DBT is the sort of thing that can go on your entire life. This is not a start to end point. You're cured. Go home. That's not how it works. It's a lifestyle that you learn, and that she was making great strides in. She had been successfully discharged from her drug and alcohol counseling. She had met with a counselor about anger issues and behavior modification, and she was doing well. She did well with all of those things and is discharged, yet still found unsatisfactory. It makes no sense. Well, because of the way the service plans work. The service plans cover a six-month period. If she is referred on month one to a counselor and she starts counseling on month five, because that's when the counselor can get in because we all understand how state budgets work, that's when you get an appointment. Then she's evaluated at month six. The caseworker looks and says, well, one out of six months she went, so she's unsatisfactory because she wasn't there all six months. Forget the fact that she wasn't referred until month two, couldn't get an appointment until month five. It's just unsatisfactory. But this was a rolling process every six months. Absolutely, yes. So what happens in 2014 when there's a hearing on a motion to withhold change? They withdraw services. What was the status at that point? Well, that depends on if you listen to the caseworker's ultimate opinion, which is unsatisfactory,  and the evidence itself is much more favorable, and the conclusions that the caseworkers come to are not supported by the evidence. And a huge part of this problem was Dr. Kosmicki's report. Dr. Kosmicki is a brilliant man. He did a very thorough evaluation, and then he testified. He's brilliant. No one is impugning his integrity in any way, shape, or form. The problem here is the left hand never knew what the right hand was doing. My client would go to counseling. She'd be there forever and ever and ever, do a good job. Her counselor said she did a good job, would discharge her, and the caseworkers would say, but she can't be okay. Didn't you read Dr. Kosmicki's report? And the caseworker would say, no, I've never seen Dr. Kosmicki's report. What are you talking about? Well, that's not my client's fault. She signed a release. She did everything she was supposed to do, but for some reason this report doesn't get from Dr. Kosmicki to other evaluators. So now we're just going to disregard what the evaluators say because they say she's doing well, and that's not what was expected by the caseworker based on Dr. Kosmicki's report. So Dr. Kosmicki testified. He did. And when he testified, when was the last time he had seen her? Evaluation. He had not seen her post any of this treatment. Four years before? I believe so, yes. And that's the issue, the second issue I was going to talk about, which is issue four in my brief. That he doesn't evaluate her after she went to drug and alcohol counseling, after she went to DBT therapy like you told her to. He didn't have new information. To me it seems like if you're going to base a decision that she can't parent based on these mental defects that he found early on in the process, let's not go through this facade of giving her a service that we're not even going to bother to see if it evaluated, if it worked. We're not going to evaluate her post-service to see if it helped to correct the problem, which is the entire point of the service, the entire point of the entire JA process. So we have no new evidence after, we have no new evidence on the, like in the vein of Dr. Kosmicki-like testimony after she did any of her services. None. So the snapshot in time really that we're looking at is the 23 months. I mean that was her only opportunity to serve. Absolutely. Now I would like to point out that she did continue to do things on her own even after services were withdrawn, as much as she could. I wanted to ask you about one of those. One of those it appeared was that she was supposed to find a new home. And there was some reference to the fact that not only did she do that, but that a safety check had been done. What is that about? Well, before children are allowed to be returned home, and while that still is the goal, the caseworker is supposed to go and make sure that the place they will return home to is appropriate. And they have rules that are enough kind of rules that would be imposed upon anyone who just has their own home with their own children in it. But once DCFS is involved, there are different rules. Like there has to be a certain amount of sleeping space, different rooms. Obviously there can't be a hole in the floor. There has to be running water. There can't be mold. All the kinds of things that unfortunately people live in those conditions all the time. Do we have mold in here? Yeah. It's everywhere. Wow. Yeah. But DCFS goes and does a check, and they make sure that this home doesn't have any of those problems and that it's okay. And they did that in this case. And what did they find? They found it was fine. It was appropriate. What point in time was that? Oh, probably three-quarters of the way through the termination hearing, I think. So that's one of the things she continued to look for. Yes. And the home thing had been a big battle from the get-go. She lived with her mother in a home that her mother owned. Her mother is a very ill, elderly woman, and my client cared for her. She also was reliant on her, essentially, to pool their income for all of them to live. We'll have time. Okay. Thank you. Yes, Camden. May it please the Court? Counsel? Jennifer Camden on behalf of the people. I'll address the timing issue that Your Honor asked about. One thing that I want to note is that a couple of these – okay, so there are four bases for the finding of unfitness that the court found in this case, the trial court found. And a couple of those apply specifically to nine-month periods after adjudication. And those would have run from 2012 to mid-to-late 2013. And so this court can affirm based on findings of unfitness for those nine-month periods, during which time the respondent was receiving services. So the fact that the respondent was not receiving services after the goal was changed and after the termination petition was filed in mid-2014 is not relevant to the respondent's efforts and progress between 2012 and 2014 when she was receiving services. And that's the period of time that was at issue, as Your Honor noted, that 23-month period in this case. Well, Your Honor, my knowledge of these matters is really limited to appellate work. I don't handle matters in the trial court. Yeah, truly, Your Honor, I don't know. It seems that the argument she's making, at least according to some of the claims that they talked about, she would be rated satisfactorily on the mental health, especially. She completed her counseling, and yet she was rated unsatisfactory. And I can't figure that out except to acknowledge what the appellant is saying. Your Honor, two points. Number one, I would note that, in the broader sense, this appeal is from the trial court's order. And the question is whether its findings of unfitness were against the manifest weight of the evidence, whether there was any evidence to support the court's order. I understand that, but what was the state's burden at the trial court? It was clear and convincing. That's certainly true. Well, Your Honor, what means? You had the state at the burden of clear and convincing evidence. And what do you think that means to us? Well, I mean, it's higher than that and lower than beyond a reasonable doubt. I would note, Your Honor, that with regard to your specific question about the mental health evaluations, that the service plans that issue, and I'm referring to the service plans between December 2012 and December 2014, many of them referred to or noted that they were rating the respondent unsatisfactory because, or in part because, the respondent failed to take personal responsibility for the fact that her children had been taken into care. What does that mean? Well, Your Honor, and again, I... I mean, I read that second question and I'm like, okay, she's pissed off because her kids got taken into care. Is that a natural reaction from her? I don't know. Well, Your Honor, I would note that those plans referred to conversations between the respondent and the caseworkers. That's another thing I noticed is various hearings. It was hearsay upon hearsay upon hearsay because they didn't have the right work for them. Did you notice that? I mean, did you notice that there was a lot of hearsay upon hearsay? It's like, you know, someone testifying who was a subsequent DCFS worker because they didn't bring the original DCFS worker in, so they were looking at all the files. I don't know, Your Honor. I think that the caseworkers that had... There were a lot of DCFS caseworkers that refused to go back in because they felt so threatened in the environment. Certainly, that was true of the housing advocate, Your Honor. I think that caseworkers... The housing issue. Yes. Certainly, I think that some of the caseworkers who testified had had extensive contact with the respondent. In addition to the DCFS caseworkers who testified, there were also the parenting skills workers who testified. That's that Project 12 ways. And also, some transportation workers. That was through that Addis service referred to in the brief. But one thing that I want to note, again, is that the respondent had the ability to cross-examine these folks at this hearing concerning the bases for these evaluations and the bases for their testimony. And, again, the issue here is whether there was any evidence, any testimonial evidence or evidence in the service plans upon which the court could have based its findings on fitness on any one of the four different bases that the court found. I'd also note that to the extent that the respondent is asking this court to act as a supportive review for DCFS and to judge, and this goes to Your Honor's question, the standards that DCFS uses when deciding whether performance is satisfactory or unsatisfactory, those standards aren't in the record. And I humbly confess I don't know what they are. Just to give you an example, the goal change was 4-17-2014. The petition was filed in June. So between April and June of that year, she was still in Project 12 ways. The permanence report showed that the mother was making progress. Visitation had been increased by DCFS, and yet you filed a petition to terminate. I don't understand why. I don't understand what happened when DCFS increased the visitation. The permanency report shows the mother is making progress with Project 12 ways. Project 12 ways is something early on she rejected completely but evidently went back to. And so during this very 60-day period of goal change, the permanency report shows progress, and yet you're unsatisfactory. So I don't understand that. I don't understand goal change. Well, Your Honor, all I know is what's in the record. Me too. I would note, however, that the permanency reports that Your Honor is referring to were not actually before the trial court. And this is discussed in the people's brief. And I know that the respondent is citing to them as well and calling this court's attention to them. But the trial court's consideration of the fitness issue is limited to what was presented to the trial court at the fitness proceedings. And those interim reports were not presented as evidence before the trial court fitness hearing. What was before the trial court was the service plans and the testimony. And so to the end, I know that the respondent is calling this court's attention to some apparent or alleged conflicts between the service plans and those reports. But it was the service plans that were before the trial court and that are before this court as the body of evidence that the trial court reviewed and the body of evidence that this court should examine to see whether the trial court's order was supported by any evidence. I'm concerned only because this very 68 amendment I'm talking about, the minute that petition was filed on June 6th, 2014, then the service plan gets filed June 30th. And the service plan that you're referencing says, project 12 ways discontinued because of bulletin. So we have a woman who's making progress with project 12 ways. The minute you file the petition, that service is withdrawn. What you want us to do is go back. You want us to ignore the three-year period that she's working on because the state has decided on a bulletin. And you want us to go to that 23-month period. Well, Your Honor, I think that those were the periods of time that are contemplated by the statute and upon which the trial court ruled. And this court can affirm based on the respondent's performance during those periods when she was receiving services. I also want to point out that the project 12 ways, and I believe it was a supervisor at that program, testified, and this was at the fitness hearing, that the respondent's fundamental parenting problems continued during their work with her until it concluded. During this time, the respondent never proved that she could ensure the safety and supervision of her children. And when parenting training ended, so this is referring to that time that you're talking about. It was actually withdrawn. Okay, it was withdrawn. She was reported, and this was, again, the evidence that was before the trial court, whose opinion we're reviewing here today, did not consistently retain or generalize those parenting skills and apply them to different situations. And the report was that she was inconsistent in providing structure or discipline. This project 12 ways supervisor testified that the respondent struggled in novel situations relating to the safety and supervision of these children and recognizing and reacting to dangerous situations. And I'd call the court's attention to the trial court's finding under section DM, small i, little 1, of failure to make reasonable efforts to correct the conditions that were the basis for the removal of the child during any nine-month period. And I'd submit that there were two different nine-month periods at issue here after the initial finding of adjudication and that the conditions that led to the removal of these children were of failure to supervise. Those were the indicated reports that followed the initial DCFS taking these children into care after the older teenager overdosed based on failure. Do you have the name of the individual who testified? Not in front of me, Your Honor. That's fine. I know it's cited in the brief, and I have it down that it was a supervisor. And in this case, as in so many cases under DM1, I think the parties are quibbling in the briefs about the scope of those conditions that were the basis of removal. Should they be interpreted as having one child overdose? That's what the respondent is arguing. Or should those conditions be defined more broadly as a failure to supervise and to recognize dangers that children are in? And the respondent in the reply brief at page 8 argues that the condition that led to the removal of the children was the one teenager's overdose. And the respondent argues or notes that, well, that never happened again. No, no child overdose during the supervised visitations that the respondent was having with their children, but I don't think the Adoption Act is drawn so narrowly that it would only permit finding of a fitness under Section DM1 where that exact condition recurs. The visit was supervised throughout the case? Absolutely. And I would note, Your Honor, that, again, at the end of the Project 12-Ways parent skill training or attempt of training, the respondent had failed to complete the safety and supervision, what they called the safety and supervision routine and the evening routine, and the record reflects that these were the longer routines lasting multiple hours. And the respondent in the reply brief notes that Project 12-Ways certified that she had successfully completed the mealtime routine and the homework routines, but the children were not removed from her care based on a lack of providing meals or help with homework. They were removed because of a lack of safety and supervision. And, again, it was those exact circumstances that Project 12-Ways supervisor noted when she said that respondent, even after this training, still had trouble recognizing and reacting to dangerous situations, such as, I suppose, the one that resulted in the teenage son's trip to the hospital where he had been left to lay unconscious for at least 24 hours and developed bed sores, during which time, as Your Honor noted, Justice Chapman, the respondent, sent her seven- and nine-year-old children into the camper to go check on him. I also want to note that during the period of time that covers those 23 months, Your Honor, there were five service plans issued between December 2012 and December 2014, the December 2014 service plan covering those first few months of June 2014. And all five of those service plans rated the respondent's performance in mental health or counseling tasks unsatisfactory. Cooperation with DCFS was also rated unsatisfactory. And the respondent on appeal is quibbling about the DCFS evaluation standards. But as people argue in the answer brief, the time to argue about those standards and DCFS's choice and application of those standards was in an administrative review process when the respondent could have won real relief. Here the question is whether the trial court's decision was against the manifest weight of the evidence. And the appellate court has held that unsatisfactory service plans or service plans that the respondent has failed to make reasonable progress on are prima facie evidence of a respondent's failure to make reasonable progress, failure to exhibit a reasonable degree of interest, concern, or responsibility, et cetera. And so it's for those reasons that the people are urging this court to affirm. Very briefly, I'd like to address the idea that my client should have pursued an administrative appeal of the unsatisfactory ratings. You'll note in the state's brief that they provide no authority for such a thing. And in all of my research, I have found no evidence that a thing like that exists. There are administrative appeals, of course, for many decisions that DCFS makes, such as indicated findings and what have you. There are very clear processes set up for that. There is no such process set up for the administrative appeal of an unsatisfactory finding. So I urge you to not be distracted by that. I think certainly Justice Cates seems to understand the problems that I have here. One thing that may help you understand this is my assumption as to why the petition to terminate was filed when it was filed is this. There are fathers involved in this case, none of whom ever did anything they were supposed to do short of a random visit here and there. And I have rarely seen a petition to terminate against one parent but not the others. So quite often that means if one parent is doing right, the others get to float along and not get terminated. Sometimes it's the exact opposite. Some parents are doing nothing and one parent is doing some stuff and they get to fight it out. It's entirely possible that she got dragged along in this because the fathers, most of whom are in prison or AWOL, were doing nothing. That may be it because certainly if you read the documents, as you clearly have, you see that the actual progress was being made and it doesn't justify a petition to terminate at all. The unsatisfactory rating regarding mother's failure to take responsibility for previous actions, isn't that a safety issue? Yes, I see where you're going with that. And my response to that is this. DCFS makes referrals to professionals who are qualified to make those decisions. In this case, those professionals made those decisions. They say she's doing a great job. Caseworkers just flat disagreed with the professionals. They just disagreed and so they imposed their opinion. I know the doctor says she's doing well, but I don't think she is, so I'm writing unsatisfactory, on the basis that she's not taking responsibility for the children being removed from her. Those are exactly the things that she was supposed to be working on. Wait, you're saying the Dr. Kosmicki? No, Dr. Kosmicki. I mean the treatment providers, Moore, what was the other one, Young, where she was receiving mental health treatment and DBT. Those are the things that they were working on there, and they said she was doing great. And the caseworkers say, eh, but she still says things to me like, I've done everything I'm supposed to do, why aren't my kids home, or you never should have taken my kids in the first place. And in the caseworker's mind, that's trumping all of the recommendations, all the opinions of the experts she sent her to. Why is there some requirement that service plans continue to be filed after the termination petition? They are not only filed after the termination petition, they're still being filed, because permanency hearings are continuing at this point until the adoption of the children are complete, and the case will finally be discharged at that point. So it's still going on. Because I noticed that the service plans continue to be filed, even though there were months delayed. One was a 1228.15 service plan that wasn't filed for six months. It had been done six months earlier, but it wasn't filed for six months. So now those service plans should have been before the court, right? Oh, yes. Yes. So if PCS had decided or the state had decided that she wasn't making progress, could another rule change have been instituted, or is it kind of a once and done and stopped? I've never seen such a thing after a termination order, but I have seen goals change. I have seen goals change to one in the back again. Yeah, I've seen that. During the pendency hearing. Could happen. Because of what she's doing. Didn't happen here, of course, but I see no reason why not. It's in the sole discretion of the state. Absolutely, yes. And that's something else I want to point out. The state is arguing that the permanency reports were not offered at the fitness hearings. They're part of the record. The court is aware of them, reads every single thing that goes in there. You have them in the record on appeal. Part of the purpose of having the intent being that the same judge stick with the case from day one until the end, if at all possible, is so that they always have a complete picture. Those permanency reports are a complete picture. They absolutely are. And there's no reason why we should assume that the court was unaware of them or argue that you shouldn't consider them at this time. This is absolutely 100% the most important decision this court ever makes. We're talking about terminating a parent-child relationship. This isn't about money or insurance or incarceration. This is the most important decision that will ever be made. And to talk about, well, that report wasn't discussed here, that report was this, that seems to me to be disingenuous. We need to focus on whether or not the right answer was reached here and whether it was done properly. The most important thing being that we're terminating the most intimate relationship there is. Let's look at the facts of the case and not get hung up in technicalities. And if we are going to get hung up in technicalities, let's talk about the five years. Let's talk about three years it took to get to a permanency answer for these children. Because if we're going to talk about technicalities, I want to talk about that. And let's fix that. We would ask that you would make it this order. Thank you. Thank you very much. Okay. This matter will be taken under advice.